In re IONOSPHERE CLUBS, INC., Eastern Air Lines, Inc., and Bar Harbor Airways, Inc., d/b/a Eastern Express, Debtors.

Martin R. SHUGRUE, Jr., as Trustee of the Estate of Eastern Air Lines, Inc., Plaintiff,

v.

PENSION BENEFIT GUARANTY CORPORATION, Defendant.

Bankruptcy Nos. 89 B 10448, 89 B 10449 and 89 B 10287. Adv. No. 92–8983A.

United States Bankruptcy Court, S.D. New York.

Dec. 9, 1992.

King & Spalding, Atlanta, GA (Daniel J. King, and Darryl S. Laddin, of counsel), for Trustee.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City (Enid Nagler Stuart, of counsel), for Pension Ben. Guar. Corp.

Nancy Heermans, Marc A. Tenebaum, Linda J. Schwimmer, Office of Gen. Counsel Pension Ben. Guar. Corp., Washington, D.C.

MEMORANDUM DECISION ON THE PENSION BENEFIT GUARANTY CORPORATION'S MOTION TO DISMISS

BURTON R. LIFLAND, Chief Judge.

This adversary proceeding is before the Court pursuant to a memorandum opinion and order of District Judge Haight dated July 22, 1992. Judge Haight conditionally granted the petition of the Pension Benefit Guaranty Corporation (the "PBGC") for withdrawal of the reference, and remanded the proceeding to this Court for the submission of proposed findings of fact and conclusions of law in accordance with 28 U.S.C. § 157(c)(1). *See Shugrue v. Pension Benefit Guaranty Corporation (In re Ionosphere Clubs, Inc.)*, 142 B.R. 645, 649 (S.D.N.Y.1992). The District Court conditioned its withdrawal of the reference upon this Court's determination of a discrete issue, namely, whether this adversary proceeding should be dismissed, because, as the PBGC asserts, Eastern previously released the PBGC from any liability it may have had relating to Eastern's pension plans. As stated in the order of the District Court, if we were to sustain the PBGC's release defense, the order of withdrawal itself would be withdrawn.

Pursuant to the District Court's conditional order, and in accordance with the discussion that follows, I find that, although the recovery sought by Martin R. Shugrue, Jr., the trustee ("Trustee"), of the estate of Eastern Airlines, Inc. ("Eastern") is large,[1] and the theory of Eastern's case novel,[2] with potentially broad policy implications,[3] the legal principles necessary to resolve the discrete issue before the Court are well established and familiar. An application of basic contract principles leads this Court to the inescapable conclusion that, prior to the commencement of this adversary proceeding, Eastern granted the PBGC a clear and unambiguous release from any liability arising out of or in any way relating to the Eastern pension plans.

## BACKGROUND

Prior to March 9, 1989 (the "Petition Date"), Eastern was a contributing sponsor, within the meaning of 29 U.S.C. § 1301(a)(13), of seven defined benefit pension plans (collectively, the "Plans"), subject to Title IV of the Employment Retirement Income Security Act of 1974 ("ERISA"). The PBGC is a wholly-owned United States Government Corporation, established under § 4002 of ERISA, and is responsible for the administration of Title IV of ERISA. Among other things, the PBGC guarantees to pension plan participants certain minimum benefits and provides for the timely and uninterrupted payment of those benefits in the event of employer underfunding or early termination of a covered plan. *See* 29 U.S.C. § 1302(a)(2).

On or about August 31, 1989, the PBGC filed claims totaling $1.4 billion in Eastern's bankruptcy case. The claims included the following: (a) a secured claim on behalf of the Plans for minimum funding contributions secured by certain collateral that the Plans held pursuant to the terms of certain minimum funding waivers that had been granted by the IRS; (b) claims on behalf of the Plans for certain minimum funding contributions that would become due post-petition, but had not been waived by the IRS; (c) claims on the PBGC's own behalf for employer plan termination liability under 29 U.S.C. § 1362, which were con-

---

1. The Trustee seeks to recover more than $117,-000,000 from the PBGC.

2. The Trustee contends that contributions made by Eastern, as sponsor of certain ongoing pension plans, during the ninety (90) days preceding its bankruptcy filing, constitute voidable preferences under 11 U.S.C. §§ 547 and 550.

3. In view of today's ruling, this Court need not consider numerous questions of interaction between bankruptcy and non-bankruptcy federal

laws, including the Internal Revenue Code (the "IRC") and ERISA, as well as the policy implications associated with any such decision. At oral argument, for example, counsel for the PBGC asserted that if the Trustee ultimately were to prevail on the merits of his claim, the Internal Revenue Service (the "IRS") "may very well be more reluctant to grant waivers ... [of its minimum funding requirements pursuant to § 412(d) of the IRC, 26 U.S.C. § 412(d)]." Transcript of Hearing at 40 ("Tr. at ___").

tingent upon termination of the Plans prior to confirmation of a plan of reorganization; and (d) claims on the PBGC's own behalf for unpaid premiums under 29 U.S.C. § 1307.

Eastern disputed both the amount and priority of the PBGC's claims. On or about September 17, 1990, after several months of negotiations, the PBGC and the Trustee, along with the Official Committee of Unsecured Creditors for Eastern (the "Creditors' Committee") and Continental Airlines Holdings Inc.[4] ("CAHI") executed a settlement agreement (the "Settlement Agreement"). In seeking this Court's approval of the Settlement Agreement, the joint application submitted by counsel for the Trustee and counsel for the Creditors' Committee indicated that, with one exception not relevant here, the Settlement Agreement "provides for a release of all claims with respect to Eastern's Plans among Eastern, PBGC and Continental Holdings, Inc....."[5] By order dated October 3, 1990, this Court approved the terms of the Settlement Agreement. The Settlement Agreement provided, *inter alia*, that CAHI would make certain payments to the Plans and that Eastern would make payments to the PBGC totaling $30 million. The Settlement Agreement further provided that the PBGC would have a "liquidated, non-contingent, non-disputed, allowed, prepetition general unsecured claim" against Eastern in the amount of $565 million. Under the Settlement Agreement, the Plans were terminated pursuant to 29 U.S.C. § 1342, and PBGC was appointed as the Plans' statutory trustee.

Several months later the parties became involved in a dispute over the validity of the PBGC's security interest in certain aircraft and engines that Eastern sought to sell. Prior to the Petition Date, Eastern received from the IRS a waiver of its minimum funding requirements for plan years 1982, 1985 and 1987. As a condition to granting a waiver for the 1985 plan year, the PBGC was granted a security interest

in certain aircraft and engines owned by Eastern. Eastern entered into amendments to the security agreement with the PBGC in 1987, 1989 and 1990.

During the summer of 1991, Eastern sought to sell, among other things, a McDonnell Douglas DC–9–31 aircraft and two engines, free and clear of liens and encumbrances. The aircraft and engines were subject to the PBGC's security interest. Prior to agreeing to release its lien on the aircraft and engines, PBGC demanded reimbursement for various legal and other expenses which it had incurred in connection with the development, preparation and enforcement of the amendments to the security agreement. Eastern claimed that all PBGC claims had been resolved pursuant to the September 17, 1990 Settlement Agreement. The PBGC disagreed, contending that the lien served as collateral for the unpaid expenses incurred by PBGC, and not covered by the Settlement Agreement.

The parties settled the dispute and submitted a stipulation, which the Court "so ordered" on July 29, 1991. The stipulation and order (collectively, the "Stipulation") required the parties to sign a letter agreement (the "Letter Agreement") as part of the Stipulation, which the PBGC contends releases it from liability with respect to any claims by Eastern relating to the Plans. The Letter Agreement provides, in relevant part, that "[t]he PBGC ... and Eastern ... agree that they have no further claims or causes of action against each other relating in any way to the Eastern pension plans...." The Trustee, while not disputing the language of the Letter Agreement, nevertheless contends that Eastern never intended to waive any claims or causes of action against the PBGC.

## PROCEDURE

On April 17, 1992, the Trustee commenced this adversary proceeding against the PBGC. On July 1, 1992, the Trustee

---

4. At the time, Eastern was a member of CAHI's controlled group within the meaning of 29 U.S.C. § 1301(a)(14).

5. The PBGC is not relying on the language of the joint application or the 1990 Settlement Agreement in support of this motion.

filed an amended complaint. On June 8, 1992, pursuant to 28 U.S.C. § 157(d), the PBGC petitioned the District Court for withdrawal of the reference. On July 22, 1992, District Judge Haight issued his conditional order of withdrawal.

On August 5, 1992, the PBGC filed a motion to dismiss the Trustee's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), as made applicable herein by Federal Rule of Bankruptcy Procedure 7012, claiming that the complaint fails to state a claim because Eastern had released the PBGC from any liability it may have had relating to the Plans pursuant to the Letter Agreement between the parties. In support of its motion to dismiss, the PBGC submitted the declaration of Harold Ashner, an Assistant General Counsel of PBGC, together with various exhibits thereto. The PBGC stated in its motion papers that if it became necessary to consider materials outside the pleadings to decide the motion, the Court should treat its motion to dismiss as one for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy Procedure 7056. PBGC's Memorandum of Law at 3 n. 1.

On September 8, 1992, the Trustee filed a memorandum of law in response to the PBGC's motion to dismiss. In opposition to the motion, the Trustee, on behalf of Eastern, submitted his own affidavit, as well as the affidavit of Brian White, Eastern's Director of Pensions and Insurance. The Trustee stated in his memorandum of law that if the Court were to consider matters outside the pleadings, the Court should treat the motion as one for summary judgment. Trustee's Memorandum of Law at 8 n. 3.

## DISCUSSION

■ When parties submit materials outside the pleadings in connection with a motion to dismiss, Rule 12(c) authorizes the Court to treat the motion as one for summary judgment under Rule 56, provided that "all parties [are afforded] reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *See Kopec v. Coughlin*, 922 F.2d 152, 154–55 (2d Cir.1991) (discussing the application of Rule 12(c)).

Although the Court did not provide the parties with formal notice prior to oral argument that the PBGC's motion would be converted to one for summary judgment, as discussed above, the parties' submissions demonstrate that they were fully apprised of the potential for conversion, and each agreed that if it were necessary to consider materials outside the pleadings, the Court should treat the motion as one for summary judgment. In view of the foregoing, and the Court's belief that this matter is susceptible to resolution in the context of summary judgment, the Court has decided to exercise its discretion and convert the PBGC's motion to one for summary judgment under Rule 56. *See generally* 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1366 (1990).[6]

■ Pursuant to Rule 56, summary judgment is appropriate if the Court determines that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *In re Chateaugay Corp.*, 116 B.R. 887, 901 (Bankr.S.D.N.Y.1990). A fact is considered material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The Court's role in ruling on a motion for summary judgment "is not to re-

---

**6.** Prior to the hearing, the PBGC submitted a statement of material facts in accordance with Local Bankruptcy Rule 13(h). Although the Trustee did not file a 13(h) statement prior to the hearing, the Trustee submitted a Rule 13(h) statement of disputed facts after this Court decided to treat the PBGC's motion as one for summary judgment.

solve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight,* 804 F.2d at 11.

■ The moving party initially bears the burden of establishing the absence of any genuine issues of material fact. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552. That burden can be satisfied by demonstrating the absence of evidence to support the non-movant's case. *Id.* at 325, 106 S.Ct. at 2553. When a motion for summary judgment is made and supported by the movant, Rule 56(e) requires the non-moving party to set forth specific facts demonstrating that genuine issues of material fact remain for trial. *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party may not defeat a properly supported motion for summary judgment by relying on self-serving and conclusory statements concerning the true nature of the facts. *See Wyler v. United States,* 725 F.2d 156, 160 (2d Cir. 1983) (non-moving party "cannot rely simply on conclusory statements or contentions that the affidavits in support of the motion are incredible"); *Knight,* 804 F.2d at 12 (non-moving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment").

■ As the Supreme Court has explained, the non-moving party must come forward with specific facts and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. If the non-moving party fails to do so, summary judgment, if appropriate, shall be entered against him. *See First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

An examination of the parties' Rule 13(h) statements, affidavits and other pleadings, indicates that no genuine dispute exists as to any material fact. As in most contract interpretation cases, the key material fact is the language of the contract itself and,

in this case, neither party disputes the existence of the contract or its content. *See, e.g., In re Hooker Investments, Inc.,* 145 B.R. 138 (Bankr.S.D.N.Y.1992). In the words of the Trustee's counsel, "[t]he language [of the contract] obviously can't be disputed, it's on its face and it is what it is." Tr. at 23.

According to the Trustee, however, summary judgment is inappropriate because genuine issues of material fact exist concerning Eastern's intent to waive any claims or causes of action against the PBGC. Specifically, the Trustee contends that summary judgment should be denied because: (i) the parties' course of conduct subsequent to the Court's approval of the Stipulation and the execution of the Letter Agreement containing the alleged release; (ii) the Trustee's testimony as set forth in his affidavit; and (iii) the language of the Stipulation, when compared with the language of the Letter Agreement, an exhibit to the Stipulation, taken together, all demonstrate that the Trustee never intended to waive any claims or causes of action Eastern may have had against the PBGC. At the very least, according to the Trustee, the existence of these circumstances tends to cast doubt on the Trustee's intentions, thereby creating an issue of fact for trial.

In accordance with the discussion that follows, the PBGC's summary judgment motion is granted. As more fully explained below, the Trustee has offered no legally sufficient reason to interpret the mutual release embodied in the Letter Agreement in a manner inconsistent with its plain meaning. Before considering the Trustee's primary contentions, however, I must first address the fundamental principles of contract interpretation that inform this Court's decision.

■ In interpreting the scope and meaning of a release, courts are guided by principles of contract interpretation. *Bartel Dental Books Co., Inc. v. Schultz,* 786 F.2d 486, 488 (2d Cir.1986), *cert. denied,* 478 U.S. 1006, 106 S.Ct. 3298, 92 L.Ed.2d 713 (1986). Contrary to the Trustee's assertions, it is well established in this Circuit that summary judgment is appropriate in

contract cases where the intent of the parties is at issue, provided the language of the contract is plain and unambiguous. *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989); *Tokio Marine & Fire Ins. v. McDonnell Douglas Corp.*, 617 F.2d 936, 940 (2d Cir.1980); *In re Chateaugay Corp.*, 116 B.R. at 901. The Court of Appeals has stated that "when a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, 'if the language of the release is clear, ... the intent of the parties [is] indicated by the language employed.'" *Locafrance U.S. Corp. v. Intermodal Systems, Inc.*, 558 F.2d 1113, 1115 (2d Cir.1977) (quoting *German Roman Catholic Orphan Home v. Liberty National Bank & Trust Co. (In re Schaefer)*, 18 N.Y.2d 314, 317, 274 N.Y.S.2d 869, 871, 221 N.E.2d 538, 540 (1966)). Only where the language of the contract is ambiguous, i.e., where it is susceptible to more than one reasonable interpretation, "and where there is relevant extrinsic evidence of the parties' actual intent, [does] the meaning of the words become an issue of fact and summary judgment [become] inappropriate." *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992).

■ As a threshold matter, therefore, we must determine whether the language of the parties' agreement is ambiguous as it pertains to the release. Whether the language of a contract is ambiguous is decided by the Court as a matter of law. *Id.* at 429. As stated above, a contract is ambiguous if it is reasonably susceptible to more than one interpretation, *Id.* at 428, and the Court makes this determination by reference to the contract alone, without considering any extrinsic evidence. *Burger King v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir.1990). Furthermore,

> Contract language is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion...."

Language whose meaning is otherwise plain is not ambiguous merely because the parties urge differing interpretations in the litigation.... The court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would "strain[ ] the contract language beyond its reasonable and ordinary meaning...."

The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable. In its efforts to preserve the parties' rights and the status quo, the court must be careful not to alter the terms of the agreement. "The parties' having agreed upon their own terms and conditions, 'the courts cannot change them and must not permit them to be violated or disregarded....'"

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990) (citations omitted).

■ In this case the plain meaning of the release is clear and unambiguous. Neither its language nor the inferences from that language are reasonably susceptible to more than one interpretation. In fact, the Trustee has utterly failed to advance any interpretation, reasonable or otherwise, to which the language might be reasonably susceptible. The release provides, in pertinent part:

> [T]he PBGC (on its own behalf and as trustee of the Eastern pension plans) and Eastern (as debtor and debtor in possession) *agree that they have no further claims or causes of action against each other relating in any way to the Eastern pension plans* (including, but not limited to, any and all claims filed by the PBGC in the Eastern bankruptcy proceeding on or about August 31, 1989) except for PBGC's allowed general unsecured claim of $565 million under the September 17, 1990, Settlement Agreement....

Letter Agreement annexed as Exhibit "3" to Declaration of Harold Ashner sworn to July 31, 1992 (emphasis added).

■ The plain language of the Letter Agreement makes it clear that Eastern released the PBGC from all claims and causes of action relating to the Plans. Both parties to the Letter Agreement were sophisticated and experienced in drafting and negotiating commercial agreements. Consequently, this case falls squarely within the general rule established by the Court of Appeals in the *Locafrance* case— "[w]hen a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel … 'if the language of the release is clear, … the intent of the parties [is] indicated by the language employed.'" *Locafrance*, 558 F.2d at 1115 (citations omitted).

If the Trustee had intended to limit the scope of the release, or, indeed, as he suggests, to not grant the PBGC a release at all, then the wording of the Letter Agreement should have so indicated. *See In re Kenston Management Co., Inc.*, 137 B.R. 100, 111 (Bankr.E.D.N.Y.1992). The result the Trustee now seeks could easily have been achieved by carving out the preference claim which it now asserts against PBGC from the broad mutual release to which the parties agreed. Having failed to do so, however, the PBGC is entitled to rely on the enforceability of the clear and unambiguous release which it obtained. I will now consider the Trustee's three primary contentions, which are addressed in turn.

■ The Trustee's first contention is that the parties' course of conduct subsequent to the Court's approval of the Stipulation and the execution of the Letter Agreement containing the alleged release demonstrates that the Trustee never intended to waive any claims or causes of action Eastern may have had against the PBGC. The Trustee relies primarily on the fact that certain PBGC employees failed to cite or rely upon the release as a bar to Eastern's attempts, subsequent to the execution of the Letter Agreement, to obtain a refund of certain alleged insurance premi-

um overpayments to the PBGC. Having determined that the language chosen by the parties is clear and unambiguous on its face, extrinsic evidence, such as the parties' subsequent course of conduct, may not properly be received in evidence. *See Metropolitan Life Ins. Co.*, 906 F.2d at 889; *Burger King Corp.*, 893 F.2d at 527 ("[p]arol evidence is admissible to aid in the interpretation of a contract only when the language of the contract is ambiguous"). *See, e.g., Factors Etc., Inc. v. Creative Card Co.*, 444 F.Supp. 279, 281–82 (S.D.N.Y.1977) (subsequent conduct may be considered to determine parties' intent only when contract language is ambiguous). In any event, the PBGC employees involved took no action inconsistent with the parties' agreement—they simply did not mention the release. The fact that certain PBGC employees, who presumably were not involved in the negotiation of the Letter Agreement, did not immediately mention the release in connection with discussions concerning an unrelated matter between the parties is irrelevant to the parties' intent to exchange broad mutual releases as demonstrated by the clear and unambiguous language of the Letter Agreement.

■ The Trustee's second contention is that his testimony, as set forth in his affidavit, conclusively demonstrates that he never intended to waive any claims or causes of action Eastern may have had against the PBGC. In his affidavit, the Trustee states that "[he] never considered waiving any of Eastern's potential claims against the PBGC" and that "it is inconceivable that [he] would have assented to the waiver of any claims against the PBGC." Trustee's affidavit at 5. As a matter of law, the Trustee's self-serving and conclusory statements concerning his subjective intent may not properly be received in evidence. *Metropolitan Life Ins. Co.*, 906 F.2d at 889; *Burger King Corp.*, 893 F.2d at 527. In any event, the Trustee's conclusory assertions concerning the "true nature of the facts" are insufficient to create an issue of fact, thereby precluding summary judgment. *See Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355; *Knight,*

804 F.2d at 12; *Wyler*, 725 F.2d at 160. As the Court of Appeals explained in *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978), the "policy favoring efficient resolution of disputes, which is the cornerstone of the summary judgment procedure, would be completely undermined if unsubstantiated assertions were permitted to compel a trial."

The Trustee's final contention is that the Stipulation signed by counsel for the Trustee and counsel for the PBGC demonstrates that the Trustee did not intend to waive any claims or causes of action that the Eastern estate might have had against the PBGC. "In stark contrast to the repeated references to settling all of the PBGC's claims against Eastern, the Stipulation and Order contains no references to settling any of Eastern's claims against the PBGC." Trustee's Memorandum of law at 10–11.

The Trustee is apparently asking the Court to draw a negative inference based on the Stipulation's silence with respect to the release of any claims or causes of action of Eastern against the PBGC. This argument is not persuasive. The Stipulation that was "so ordered" by this Court on July 29, 1991 required the parties to enter into the Letter Agreement, which was annexed as Exhibit "C" to the Stipulation. Consequently, on July 29, 1991, this Court approved the entire agreement between Eastern and the PBGC, including the Letter Agreement containing the broad and unambiguous mutual release.

By his argument, the Trustee is apparently asking this Court to interpret the Stipulation's silence concerning the release of the PBGC as if it were an affirmative declaration. The Court declines the Trustee's invitation. Had Eastern specifically reserved its rights in the Stipulation with respect to any claims or causes of action which it may later assert against the PBGC, and then waived those same rights in the Letter Agreement, this Court might have found the language of the parties'

agreement ambiguous under the circumstances, and denied the PBGC's summary judgment motion. However, where one part of the parties' agreement is silent with respect to Eastern's release of claims or causes of action against the PBGC, and another part of the same agreement clearly and unambiguously releases the PBGC from any liability relating to the Plans, the Court does not find any reason to interpret the language of the release in a manner inconsistent with its plain terms.

### CONCLUSION

For the foregoing reasons, the PBGC's motion for summary judgment is granted. The parties are instructed to submit an order consistent with this memorandum decision.[7]

---

**7.** In accordance with the District Court's conditional order, it is assumed that the order of withdrawal will itself be subject to withdrawal as a consequence of this memorandum decision and to further proceedings before Judge Haight.