In re **MAXWELL NEWSPAPERS, INC.,**
**d/b/a Daily News, Debtor.**

**Bankruptcy No. 91 B 15531.**

United States Bankruptcy Court,
S.D. New York.

Feb. 23, 1993.

Jones, Day, Reavis & Pogue by Marc S. Kirschner and Fredrick E. Sherman, New York City, for Maxwell Newspapers, Inc. d/b/a Daily News.

Winston & Strawn by Howard Seife, New York City, for the Official Committee of Unsecured Creditors.

Stroock & Stroock & Lavan by Brian M. Cogan and Mark S. Cheffo, New York City, for Mirror Group Newspapers, PLC, MGN Ltd. and RTI Holdings, Inc.

## DECISION ON DEBTOR'S MOTION FOR SUMMARY JUDGMENT EXPUNGING CLAIMS OF MIRROR GROUP NEWSPAPERS, PLC, MGN LIMITED AND RTI HOLDINGS, INC.

TINA L. BROZMAN, Bankruptcy Judge.

At a time when the Daily News' extinction was but days away, in early 1991, there appeared Robert Maxwell, the seeming savior who was paid over $60,000,000 to take the newspaper off the hands of its former owner. It was through this debtor, Maxwell Newspapers, Inc. (which did business as and, for ease of reference, will be called in this opinion the "Daily News"), that Maxwell acquired the Daily News. From the facts brought out in the Daily News' summary judgment motion, a good many of which are uncontested, the late Mr. Maxwell appears to have moved countless millions of dollars among his various enterprises without regard to the propriety of his actions and the consequences which he was causing, thereby exposing this relatively small business to potential claims of affiliated entities in the hundreds of millions of dollars. This decision deals with the claims of Mirror Group Newspapers, plc ("Mirror") and of its two subsidiaries, MGN Limited and RTI Holdings, Inc. (collectively the three will be called "MGN"), which aggregate some $110,000,000.

I.

Maxwell's empire comprised two components, the "private side" companies owned by the Maxwell family and believed to be headed by Headington Investments, Ltd., ("Headington") and the "public side" companies headed by Maxwell Communication Corporation plc ("MCC"), which is owned publicly and in minority part by Headington. *See In re Brierley*, 145 B.R. 151, 154 (Bankr.S.D.N.Y.1992). The Daily News is private side, being indirectly owned by Headington. Mirror is a publicly traded

company, a substantial number of whose shares are owned by Headington.

Through the newspaper which it owned until very recently, this debtor had strong local ties. Yet its chapter 11 case is but a small part of a large transnational bankruptcy, implicating three chapter 11 cases in this court and scores of administrations and windings-up in London. As this decision illustrates, many of the Maxwell-related entities have claims one against the other which need be sorted out through, one hopes, negotiation or, failing that, extensive litigation.

It was on March 14, 1991 that Robert Maxwell acquired ultimate ownership and control of the tabloid from the Tribune Company. Virtually immediately, he installed himself as chairman of its board of directors. From that time until a month or so after his death in November 1991, Maxwell and members of his immediate family dominated the Daily News' board of directors and, according to the debtor, exercised complete control over it.

Once ensconced, Maxwell instructed the Daily News' comptroller, Marshall Genger, to set up several bank accounts for its operational use. With the help of Kathleen Guinessey, treasurer of Macmillan, Inc. (the well-known publishing company which is a subsidiary of MCC), Genger set up accounts at Chase Manhattan Bank, N.A. ("Chase") as well as at Nebanco, Continental and Mellon Banks. At Chase, Genger set up operating, payroll and disbursement accounts. Guinessey also opened an account in the Daily News' name at National Westminster Bank ("NatWest"). The Daily News claims that none of its employees, save Robert Maxwell and his son Kevin, as well as people with a prior affiliation to the Maxwell companies, even knew of the NatWest account until late May or early June 1991.

On the heels of these activities, Maxwell, who at all times had authority to transfer funds into or out of any of the Daily News' accounts, began using the bank accounts for the numerous transfers that, over the next eight or nine months, would make up what the Daily News itself now describes as the "fraudulent scheme" through which Robert and Kevin misappropriated funds of various Maxwell-controlled entities. *See* Debtor's Local Rule 13(h) Statement at ¶¶ 16–18. Between March and November 1991, some $238 million was transferred into the Daily News' accounts and most was promptly transferred out. Cogan Aff., Exh. D. The Daily News does not dispute that it was cash-starved and looked to Maxwell for money. Sherman Decl., Ex. F at 60. Nor does the Daily News dispute that, as a result of the Maxwells' fraudulent scheme, the Daily News retained a benefit in the form of a net balance of nearly $7,000,000. Cogan Aff., Exh. D. What the Daily News does say is that this apparent benefit is irrelevant to MGN's claims because if one looks to the four-day period during which funds of MGN, rather than funds of other Maxwell-related entities, were received and disbursed by the Daily News, the Daily News was left short by some $377,000, a factual point which MGN does not dispute. Thus, the Daily News says, it too sustained a loss from Maxwell's actions and ought not be held accountable to MGN for the $110,000,000 siphoned from it; the Daily News and MGN are either both victims of Maxwell, or, if they cannot divorce themselves from him, equally culpable for his actions and, therefore, not chargeable with intercompany claims of one another.

The four days on which the Daily News focuses begin on October 21, 1991 and end on October 24. But the prelude to what happened during those days was on October 18. On that date, Larry Bloom, the senior vice president of the Daily News, was attending a conference in Washington when he received a telephone call from Maxwell. Maxwell informed Bloom that Maxwell would soon be transferring approximately $86 million into the Daily News' accounts, and that although the majority of that money would be promptly transferred out, some money would remain for the Daily News' operating needs. Cogan Aff., Exh. A at 111. Maxwell indicated that the monies deposited were funds derived from the sale of shares of Scitex Corporation, a company in which Bloom

understood Maxwell to be a shareholder. *Id.* at 110. Bloom assured Maxwell that Genger was capable of carrying out those transactions in Bloom's absence. Following this conversation, Bloom alerted Genger to the impending transfers.

Three days later, on October 21, Genger received a telephone call from Kevin Maxwell. Consistent with the conversation between Bloom and Robert Maxwell, Kevin told Genger that the Scitex funds were to be transferred into and right out of the Daily News' operating accounts, but that some funds would remain in the Daily News' accounts for its operating use. Genger believed that the Daily News would be left with some $9 or $10 million from the transactions, an amount which he later characterized as "barely adequate" to pay past due Daily News obligations. Cogan Aff., Exh. B at 60. Over the next three days, following orders given by Robert and Kevin, Genger transferred the following amounts into and out of the Daily News' accounts:

Transfers In:

| Date | Amount |
|---|---|
| 10/21 | $ 86,105,000.00 |
| 10/22 | $ 22,000,000.00 |
| 10/23 | $ 2,200,000.00 |
| 10/23 | $ 1,700,000.00 |
| 10/24 | $ 1,000,000.00 |
| Total Amount | $113,005,000.00 |

Transfers Out:

| Date | Amount |
|---|---|
| 10/21 | $ 55,786,352.25 |
| 10/21 | $ 8,818,673.21 |
| 10/22 | $ 6,246.56 |
| 10/22 | $ 21,000,000.00 |
| 10/22 | $ 17,770,560.00 |
| 10/23 | $ 9,000,000.00 |
| 10/24 | $ 1,000,000.00 |
| Total Amount | $113,381,832.02 |

Bloom and Genger both believed that the $86,105,000 transferred into the Daily News' accounts on October 21 represented the proceeds of the Scitex sale, but the funds were actually the proceeds of a loan made by Bankers Trust to MGN Limited at the behest of Robert and Kevin Maxwell and Mirror director Michael Stoney. Shortly after Genger transferred the loan proceeds into the Daily News' accounts, Kevin directed him to transfer them out to Bankers Trust (to repay an earlier loan Bankers Trust had made to Mirror Group, PLC (now Robert Maxwell Group, PLC)).

MGN attributes its losses to collusion among a group of individuals but has publicly acknowledged weaknesses which may have played a part in the diversion of MGN's funds. They include: internal controls and operating procedures which failed to identify related party transactions and bring them to the attention of the independent directors for their approval; funds transfers permitted on the authority of Robert Maxwell alone or of other directors who were also directors of other Maxwell-controlled companies without the Audit Committee (consisting of non-executive directors) having been convened; inadequate authority of the finance department to verify and record the activities carried out by the treasury department; and the resultant lack of proper documentation relating to these activities which would have enabled

the keeping of proper books of account. Sherman Decl., Exh. H at 10.

With Robert Maxwell's death and the collapse of his finances, the Daily News filed for relief under chapter 11 of the Bankruptcy Code. MGN filed proofs of claim totaling $110,000,000 based on, among other grounds, Maxwell's fraudulent misappropriation and conversion of its funds and the Daily News' alleged aiding and abetting of a breach of fiduciary duty by MGN's directors. The Daily News, along with its Official Committee of Unsecured Creditors, objected to MGN's claims and sought to expunge them. The Daily News has moved for summary judgment which MGN opposes because of asserted material factual disputes centering primarily on those facts necessary to determine whether the acts of the Maxwells, father and son, ought be imputed to the Daily News.[1] MGN accuses the Daily News of turning a blind eye to the actions of Robert and Kevin Maxwell because of the Daily News' expressed need for cash to operate; the Daily News, for its part, accuses MGN of failing to prevent a fraudulent disposition of its own funds.

## II.

Federal Rule of Civil Procedure 56(c), made applicable to these proceedings by Federal Rules of Bankruptcy Procedure 9014 and 7056, provides that summary judgment is appropriate if the court determines that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *In re Ionosphere Clubs, Inc.,* 147 B.R. 855, 860 (Bankr. S.D.N.Y.1992). A fact is considered material if it "might affect the outcome of the

suit under governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. In considering a motion for summary judgment, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Carter v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 11 (2d Cir.), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The moving party initially bears the burden of establishing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *In re Ionosphere Clubs, Inc.,* 147 B.R. at 861. That burden can be satisfied by demonstrating the absence of evidence supporting the non-movant's case. *Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. at 2553. When a motion for summary judgment is made and supported by the movant, Rule 56(e) requires the nonmoving party to set forth specific facts demonstrating that genuine issues of material fact remain for trial. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The non-moving party may not defeat a properly supported motion for summary judgment by relying on self-serving and conclusory statements concerning the true nature of the facts. *Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983). As the Supreme Court has noted, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. at 586, 106 S.Ct. at 1355; *cf. In re Ionosphere Clubs, Inc.,* 147 B.R. at 861.

The debtor seeks to expunge MGN's claims by summary judgment because: (i) MGN's funds were transferred into and out

---

1. No one has sought to equitably subordinate MGN's claims, if they are allowable, to the claims of the general unsecured creditors.

Nothing in this opinion is meant to comment on the propriety or availability of such relief.

of the Daily News' accounts in "conduit" fashion without benefit to the Daily News; (ii) the fraudulent activities of Robert and Kevin Maxwell cannot be imputed to the debtor based on principles of agency law, because these "agents" totally abandoned their agency and acted to defraud, not benefit, the debtor, thus bringing into play the adverse interest exception to the general rule that the acts of an agent acting with real or apparent authority are imputed to the principal; and (iii) the doctrines of *in pari delicto*, unclean hands and equitable estoppel bar MGN's claims.

## MGN'S PROOFS OF CLAIM: NOT A MODEL OF CLARITY

MGN's proofs of claim offer little insight into the causes of action upon which it seeks recovery. Although separate proofs of claim were filed for Mirror, MGN Limited and RTI Holdings, Inc., common threads run through each: allegations of conversion, fraud, aiding and abetting a conspiracy to defraud, aiding and abetting a breach of fiduciary duty and breach of contract. Sherman Decl. at Exh. A–E. What MGN has failed to do, however, is provide any guidance in the documents that accompany the proofs of claim as to why those causes of action should stand. By way of example, MGN asserts a cause of action for breach of contract. Yet nowhere in its papers does MGN describe what contract(s), if any, the debtor entered into with MGN and thereafter breached. With respect to its fraud claim, MGN not only fails to particularize its claim with the specificity required under Federal Rule of Civil Procedure 9(b), but does not address what misrepresentations the Daily News may have made and, assuming that the debtor made some misrepresentation, exactly how MGN relied on that misrepresentation.[2]

Given that MGN has not fleshed out its claims and that the debtor has painted its asserted defenses to the claims with what certainly may be characterized as an extremely broad brush, the record is not clear enough for me to conclude that this motion

is ripe. However, Federal Rule of Bankruptcy Procedure 9014 grants me the discretion to direct parties to bring what would otherwise be considered a contested matter in the form of an adversary proceeding. *See In re Reveley*, 148 B.R. 398, 400 (Bankr.S.D.N.Y.1992). Therefore, I will direct MGN to commence an adversary proceeding and replead its claims with whatever particularity and elements each requires. Notwithstanding my inability to rule on the Daily News' summary judgment motion as presented, there are certain legal issues laid out by the parties which I can, and will, address.

## MAY MGN ASSERT THESE CLAIMS?

MGN, in its brief, borrows heavily from *In re Wedtech Securities Litigation*, 138 B.R. 5 (S.D.N.Y.1992). Yet MGN ignores a pivotal issue raised there by Judge Sand: that is, whether the claimant is the proper party to assert the claims against the debtor.

MGN employs agency principles, arguing that Robert and Kevin Maxwell, as agents of the Daily News, carried out these deceptive transfers on behalf of the Daily News and, therefore, their acts should be imputed to their principal. At the same time, however, MGN suggests that the acts of those same individuals, who were agents of MGN as well, should not be imputed to MGN.

 Under general principles of agency law, the liability of a principal to a third person upon a transaction conducted by an agent may be based upon the fact that:

(a) the agent was authorized;

(b) the agent was apparently authorized; or

(c) the agent had a power arising from the agency relation and not dependent upon authority or apparent authority.

*Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023, 1027–28 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992), *citing* Restatement (Second) of Agency § 140 at 349 (1958).

---

**2.** In fact, a review of both the hearing transcript and MGN's papers suggests that MGN may have abandoned its breach of contract and aiding and abetting claims, choosing to rely primarily upon its claims for conversion and fraud.

The general rule is that the acts and knowledge of an agent acting within the scope of his agency are imputed to the agent's principal. *Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 784, 497 N.Y.S.2d 898, 899, 488 N.E.2d 828, 829 (1985). The principal is also liable for the agent's misrepresentations that cause pecuniary loss to a third party when the agent acts within the scope of his apparent authority. *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *Maritime Ventures Intern., Inc. v. Caribbean Trading & Fidelity, Ltd.,* 689 F.Supp. 1340, 1355 (S.D.N.Y.1988); *FDIC v. Reisman (In re Reisman),* 149 B.R. 31, 38 (Bankr. S.D.N.Y.1993). In the case of a corporation, which can act only through its agents, the rule is that the actions of corporate directors and officers are attributable to the corporate entity. *Tew v. Chase Manhattan Bank,* 728 F.Supp. 1551, 1559 (S.D.Fla.1990), *amended in part,* 741 F.Supp. 220 (S.D.Fla.1990). As with virtually all rules, however, there is at least one exception. Under the adverse interest exception, when an agent is engaged in a scheme to *defraud* a principal, either for his own benefit or that of a third party, the knowledge and misconduct of the agent are not imputed to the principal. The law does not presume that the wrongdoer would perform his usual duty of disclosing all material facts regarding his action if such disclosure would reveal his fraud. *Id.* (emphasis added); *cf. In re Crazy Eddie Securities Litigation,* 802 F.Supp. 804 (E.D.N.Y. 1992); *In re Wedtech Securities Litigation,* 138 B.R. at 9; *Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d at 784, 497 N.Y.S.2d at 899–900, 488 N.E.2d at 829–830; *In re Drexel Burnham Lambert Group, Inc.,* 148 B.R. 1002, 1010 (S.D.N.Y. 1993). New York courts construe this exception narrowly. *Tew v. Chase Manhattan Bank, N.A.,* 728 F.Supp. at 1560. To come within the "adverse interest" exception, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes. *Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d at 784–85, 497 N.Y.S.2d at 900, 488 N.E.2d at 830. The exception cannot be invoked merely because the agent has a conflict of interest or because he is not acting primarily for his principal. *Id.* Thus, the exception is not applicable when the agent acts both for himself and for the principal, though his primary interest is inimical to the principal. *In re Crazy Eddie Securities Litigation,* 802 F.Supp. at 817, *citing In re Investors Funding Corp. Securities Litigation,* 523 F.Supp. 533, 541 (S.D.N.Y.1980).[3]

▮ MGN utilizes precisely this analysis to ask me to deny summary judgment on the basis that there are factual questions regarding whether Maxwell was acting, in part, for the benefit of the Daily News. Yet this very same analysis necessarily leads one to question whether MGN may assert its claims, for "a claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 120 (2d Cir. 1991).[4]

In *Wagoner,* the debtor's trustee in bankruptcy claimed that the brokerage house aided and abetted the debtor's sole stockholder and decisionmaker in making bad trades that dissipated corporate funds. The trustee alleged various tort and contract claims. The Second Circuit, noting that the debtor's stockholder "not only knew of the bad investments, but actively

3. This principle is applied to a debtor-in-possession, because it is subject to all claims and defenses which might have been asserted against the debtor before bankruptcy (except where it is asserting the claims of creditors under the various avoiding powers contained in the Bankruptcy Code). *Miller v. New York Produce Exchange,* 550 F.2d 762, 768 (2d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977).

4. The law of fraudulent transfers is to like effect. The guilty transferor generally cannot recover from his transferee. As between the two, the transfer is valid; it is only when the rights of creditors of the transferor intervene that the transfer may be assailed. *See, e.g.,* 30 N.Y.Jur. 2d, *Creditors' Rights* ¶ 320 (1983).

forwarded them," and that the brokerage house owed no fiduciary duty to the debtor/customer, held that the debtor's trustee, who was asserting the claims belonging to the debtor, lacked standing. *Id.* at 120; *cf. In re Wedtech Securities Litigation*, 138 B.R. at 7–8. Whether Maxwell's acts can be imputed to MGN, and thereby defeat its claims, is a key, unresolved issue which turns on a factual record far from fully developed. Moreover, on a motion for summary judgment, any inferences must be drawn in favor of the nonmoving party, so I cannot grant summary judgment to the Daily News.[5]

MAY THE DEBTOR BE ABSOLVED OF LIABILITY IF IT RECEIVED NO BENEFIT FROM THE FUNDS TRANSFERRED TO IT BY MGN OR HAD NO CONTROL OVER THOSE FUNDS?

■ There is a number of different doctrines by which the recipient of what seems to be a voidable transfer may escape liability to the debtor's estate when that recipient received no benefit from that transfer. One of these doctrines is the "mere conduit theory," deriving from Judge Cardozo's opinion in *Carson v. Federal Reserve Bank of New York*, 254 N.Y. 218, 235–36, 172 N.E. 475 (1930), which says that where the recipient of a transfer is but an agent of the creditor to whom the agent, without any benefit to himself, passes along property, liability will not attach to the agent. *Id.; cf. Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir.1988); *Huffman v. Commerce Security Corp. (In re Harbour)*, 845 F.2d 1254, 1257–58 (4th Cir.1988); *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir.1988); *Official Committee of Unsecured Creditors v. U.S. Dep't of Labor (In re Dairy Stores)*, 148 B.R. 6, 9 (Bankr.D.N.J.1992); *Salomon v. Nedlloyd, Inc. (In re Black & Geddes, Inc.)*, 59 B.R. 873, 875 (Bankr. S.D.N.Y.1986); *Gropper v. Unitrac, S.A.*

*(In re Fabric Buys of Jericho, Inc.)*, 33 B.R. 334 (Bankr.S.D.N.Y.1983).

■ Where, however, the "mere conduit" remains in possession of some portion of the funds, he will be held liable up to the amount of the funds which he retains. *Commercial Recovery, Inc. v. Mill Street, Inc. (In re Mill Street, Inc.)*, 96 B.R. 268 (9th Cir.B.A.P.1989).

■ Another of these theories for escaping liability is the "earmarking" doctrine, which provides that if property transferred by the debtor in payment of a debt was never truly within the control of the debtor or subject to the debtor's direction, then a transfer of such property would not be a preference. *Official Bondholders' Committee v. Eastern Utilities Associates (In re EUA Power Corp.)*, 147 B.R. 634, 640 (Bankr.D.N.H.1992). If all that occurs by virtue of a transfer is that one creditor is substituted for another, no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, but the identity of the creditor has changed. *Matter of Smith*, 966 F.2d 1527, 1533 (7th Cir.), *cert. dismissed*, —— U.S. ——, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992); *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 565–66 (8th Cir. 1988). The dispositive inquiry is whether the debtor had control over the funds. *Herzog v. Sunarhauserman (In re Network 90 Degrees, Inc.)*, 126 B.R. 990, 995 (N.D.Ill.1991); *cf. Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1362 (5th Cir.1986).

■ Both doctrines are judge-made equitable exceptions to liability for voidable transfers. The Daily News suggests that the first of them, the "mere conduit" theory, ought to be imported to this case. MGN urges that the theory can be utilized only in conjunction with avoidance actions. I would suggest that both doctrines may be available here. For although MGN couch-

---

5. By a similar analysis, one could ultimately conclude, after imputing Maxwell's acts to MGN, that the Daily News could not have converted MGN's funds, since the Daily News' possession was with the permission of MGN, notwithstanding that there may have been damage to creditors of MGN. *See Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir.1993) (declaring that conversion requires a wrongful or unlawful appropriation of personal property by one not entitled to possession.)

es its claims as sounding in common law fraud (without identifying any of the necessary elements), breach of contract (without identifying any contract) and conversion (notwithstanding that Maxwell concededly had some authority to make the transfers, albeit that he may have defrauded creditors of MGN in the process), one is left with the nagging impression that MGN is really trying to avoid, as fraudulent, transfers made by MGN to the Daily News (which MGN may have no standing to do).

In short, when one looks not at the labels which MGN affixes to its claims but at the relief which it is seeking, recovery of money which it improperly transferred to the Daily News, one realizes that these doctrines cannot be said today, as a matter of law, to be inapplicable. Indeed, once MGN is made to properly plead its claims and once the facts are fully developed, it may well be that the Daily News will be seen to have been correct.

### III.

In the end, it is unclear what causes of action MGN is still pursuing and which ones, if any, it has abandoned. There are the potential issues of whether the acts of Robert and Kevin Maxwell can be imputed to both the debtor and MGN, or whether the adverse interest exception precludes imputation to either. Questions exist as to whether MGN is estopped from bringing these claims and whether these causes of action, if valid, could only be properly pursued by MGN's creditors. Formal pleadings are warranted because one suspects that MGN is trying, with its claims, to make a glove fit on a foot. Further, factual issues need be developed in light of this opinion. Plainly, the complexity and existence of such issues makes these proceedings incapable of resolution on a summary judgment motion.

Accordingly, the debtor's motion for summary judgment is denied. MGN is directed to replead its claims in a complaint commencing an adversary proceeding.

SETTLE ORDER consistent with this opinion.