In re **MASTERWEAR CORPORATION,**
**et al., Debtors.**

**Masterwear Corporation,**
**et al., Plaintiffs,**

v.

**Angel & Frankel, P.C., Defendant.**

**Bankruptcy Nos. 97 B 47083(SMB),**
**to 97 B 47088(SMB).**
**Adversary No. 98/8723A.**

United States Bankruptcy Court,
S.D. New York.

April 9, 1999.

Coleman, Rhine & Goodwin LLP, New York City, Ira Daniel Tokayer, of Counsel, for Plaintiff.

Angel & Frankel, P.C., New York City, Joshua J. Angel, Robert A. Abrams, of Counsel, for Defendant Pro Se.

## MEMORANDUM DECISION GRANT-ING PARTIAL SUMMARY JUDG-MENT TO THE PARTIES

STUART M. BERNSTEIN,
Bankruptcy Judge.

The debtors (collectively "Masterwear") commenced this adversary proceeding to recover a $20,000.00 retainer paid prepeti-

tion to the defendant law firm, Angel & Frankel, P.C. (the "Firm"). Former management hired the Firm and paid the retainer, but a new board replaced the former board following a contested election, and immediately fired the Firm. Ignoring the discharge, the Firm continued to perform legal services. It claims it earned the $20,000.00 through both pre-discharge and post-discharge services, and moves for summary judgment. Masterwear also requests summary judgment, but has not made a formal motion.

The principal issue before me is whether the new board had the authority to fire the Firm. I conclude that it did. Accordingly, the Firm is entitled to partial summary judgment in an amount equal to the reasonable value of its pre-discharge services, and Masterwear is entitled to partial summary judgment in an amount equal to the balance of the retainer. The remaining requests for relief are denied.

## FACTS

Masterwear is a Delaware corporation. Prior to the events described below, Norman Bernard, Brad Bernard and Albert Mushkin (collectively, the "Bernard Group") were Masterwear's officers and directors. (*Affirmation of Joshua Angel in Support of Motion for Summary Judgment*, sworn to Feb. 18, 1999 ("*Angel Affirmation*"), ¶ 2.) Signal Capital Corporation ("Signal") was also a shareholder of Masterwear.

Beginning sometime prior to 1997, Signal contended that the members of Bernard Group had breached their fiduciary and contractual duties to Masterwear by unlawfully extending their employment agreements and taking excessive and unauthorized compensation and reimbursement for personal expenses.[1] After following certain pre-election procedures that are not in dispute, Signal issued a notice of a special meeting of shareholders to elect a new board. (*Williams Affidavit*, Ex. "A".) The special meeting was scheduled for July 2, 1997.

On the date of the meeting, the Bernard Group attempted to prevent it by seeking injunctive relief in state supreme court. State Supreme Court Justice Charles E. Ramos denied the request for immediate relief from the bench. (*Williams Affidavit*, Ex. "E", at 2.)[2] The meeting went forward, and the shareholders elected Eben S. Moulton, Walter H. Leonard and Willis A. Williams, as the new board of directors. (*Williams Affidavit*, Ex. "C".) All three are associated with Signal. They will be referred to as the "Signal Directors," and where the context permits, the "Signal Board." The Signal Board also nominated and elected Williams Vice President and Assistant Secretary of Masterwear, (*Williams Affidavit*, Ex. "C"), but did not replace the existing Bernard Group officers.[3]

The Bernard Group apparently continued to contest the election, (*see Williams*

1. On or about February 13, 1997, Signal commenced a shareholder derivative action in state court against the Bernard Group based on these charges. (*Affidavit of Willis A. Williams in Opposition to Motion for Summary Judgment*, sworn to Mar. 10, 1999 ("*Williams Affidavit*"), Ex. "L".)

2. In a later decision memorializing the ruling, Justice Ramos explained that the "undisputed violations" by the Bernard Group entitled Signal to call a special meeting to elect a new board. (*Williams Affidavit*, Ex. "B".)

3. The record is unclear on the status of the Bernard Group as officers after July 2nd. Norman Bernard, who suffered from medical problems, tendered his resignation as an officer on June 18, 1997. (*Williams Affidavit*, Ex. "H".) Thereafter, Brad Bernard tendered his resignation as officer and director on July 21, 1997, (*id.*, Ex. "I"), and Mushkin followed suit on August 15, 1997. (*Id.*, Ex. "J".) On August 4, 1997, however, Willis Williams wrote to the Bank of New York ("BNY"), Masterwear's factor, stating that the Signal Board had not replaced the officers, and BNY should continue to deal with the officers on day-to-day financing transactions. (*Angel Affirmation*, Ex. "C".) Mr. Williams' letter does not identify the officers, but it presumably refers to one or more members of the Bernard Group rather than himself.

*Affidavit*, Ex. "E", at 3), but the submissions do not describe what occurred. On or about September 18, 1997, the parties entered into a "so ordered" stipulation in the state court. (*Id.*, Ex. "E".) The stipulation ended the challenge. The Bernard Group acknowledged that the Signal Directors constituted the duly elected Masterwear board since July 2, 1997, and agreed not to interfere with the board or the Signal Directors. (*Id.*)

While these events unfolded, Masterwear continued to suffer from severe financial problems. On or about June 18, 1997, Joshua Angel, Esq., a member of the Firm, met with "Masterwear's management" (*i.e.*, the Bernard Group),[4] and agreed to represent Masterwear in addressing its deteriorating financial condition. (*Angel Affirmation*, ¶ 5.) The parties did not execute a written retainer agreement. According to Mr. Angel, the oral agreement included a flat fee of $20,000.00 at the commencement of the representation and another flat fee of $20,000.00 at its conclusion. (*Id.*)

Five weeks later—and after the election of the new board—the Firm received a $20,000.00 retainer on July 22, 1997, for services rendered and to be rendered in connection with effecting a common law composition. (*Id.*) Only two days later, however, the new board discharged the Firm. On July 24th, counsel to the Signal Board—and now Masterwear—delivered a letter to the Firm stating that the Firm was not authorized to act on behalf of Masterwear, and demanding the refund of the retainer. (*Id.*, Ex. "F".)

The Firm ignored the request. It continued to perform legal services until September 10, 1997, (*see Williams Affidavit*, Ex. "K", at 3), purportedly on behalf of Masterwear, in connection with the common law composition.[5] On October 27, 1997, Masterwear filed their chapter 11 petitions, and on July 10, 1998, filed this adversary proceeding.

## DISCUSSION

### A. Standards Governing Summary Judgment Motions

Fed.R.Civ.P. 56(c)[6], made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056, governs summary judgment motions. Under the Rule, the Court will grant judgment if the submissions show that no genuine material issues of fact exist, and the movant is entitled to judgment as a matter of law. *Accord, Cargill, Inc. v. Charles Kowsky Resources, Inc.*, 949 F.2d 51, 55 (2d Cir.1991); *In re Maxwell Newspapers, Inc.*, 151 B.R. 63, 67 (Bankr.S.D.N.Y.1993); *Shugrue v. Pension Benefit Guar. Corp. (In re Ionosphere Clubs, Inc.)*, 147 B.R. 855, 860 (Bankr. S.D.N.Y.1992). A material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court cannot resolve disputed issues of fact, but instead, must assess whether any factual issues

---

**4.** Coincidentally, Norman Bernard tendered his resignation as an officer on that same day. (*See Williams Affidavit*, Ex. "H".) Mr. Angel does not specify who in the Bernard Group actually retained him.

**5.** I say "purportedly" because Masterwear alleges that the Firm was actually representing the Bernard Group. (*See Williams Affidavit*, ¶¶ 6–7.) I need not reach this issue to decide the motion before me.

**6.** Rule 56(c) states:
 The motion shall be served at least 10 days before the time fixed for the hearing.
The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

exist, and resolve any ambiguities or inferences against the moving party. *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

If the movant carries the initial burden of demonstrating the absence of genuine factual issues, the nonmoving party cannot rely on pleadings or mere denials, and must set forth specific facts that show triable issues. Fed.R.Civ.P. 56(e) [7]. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must show that there is more than a metaphysical doubt regarding a material fact, *Matsushita Elec. v. Zenith,* 475 U.S. at 586, 106 S.Ct. 1348; *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 146 (2d Cir.1993), and may not rely solely on self-serving conclusory statements. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *Wyler v. U.S.,* 725 F.2d 156, 160 (2d Cir. 1983).

**B. The Signal Board's Authority to Fire the Firm**

■ As noted, this case comes down to the authority of the Signal Board to fire the Firm. Delaware law vests the board of directors with the authority to manage the corporation, Del.Code Ann., title 8, § 141(a)(1998)("Del.Corp.Law"), and this includes the authority to hire and fire lawyers. The Firm concedes this general proposition. (*See Supplemental Affidavit by Angel & Frankel, P.C. [sic] in Support of Motion for Summary Judgment,* sworn to [by Joshua J. Angel], Mar. 16, 1999, at ¶ 3.) It contends, however, that if the election of a new board is contested, only the old board can speak for the company until the contest is resolved. (*Id.*) The law does not support this premise.

■ When a corporation elects directors, it will be presumed that their election was regular, and that all legal requirements have been met. 2 Victoria A. Braucher, *et al.,* *Fletcher Cyclopedia of the Law of Private Corporations* § 296, at 98 (1998 rev. ed.)("*Fletcher*"). If, however, the director holds and exercises the power of his office under color and claim of an irregular election, he is not a *de jure* director but is still a *de facto* director. *Blish v. Thompson Automatic Arms Corp.,* 64 A.2d 581, 603–04 (Del.1948); *Prickett v. American Steel & Pump Corp.,* 253 A.2d 86, 88 (Del.Ch.1969); *Drob v. National Memorial Park,* 41 A.2d 589, 598 (Del.Ch. 1945); *Fletcher* § 374, at 213–14; Harry G. Henn & John R. Alexander, *Laws of Corporations and Other Business Enterprises* § 206, at 562 (3rd ed. 1983)("*Henn*"); 18B Am.Jur.2d, *Corporations* § 1415 (1985). A board consisting of *de facto* directors has the same authority as a *de jure* board to bind the corporation, at least insofar as third persons are concerned. *Drob v. National Memorial Park,* 41 A.2d at 598; *Fletcher* § 380, at 223–24; *see Dillon v. Scotten, Dillon Co.,* 335 F.Supp. 566, 569 (D.Del.1971). The status of a *de facto* director may be attacked

---

7. Rule 56(e) states:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

directly by a shareholder or another director, Del. Corp. Law § 225(a); *see Young v. Janas,* 103 A.2d 299, 301 (Del.Ch. 1954); but his title and the validity of his acts are usually not subject to collateral attack. *Henn* § 206, at 562; *see Fletcher* § 387, at 232.

■ This latter point leads me initially to question the Firm's standing. The Signal Directors were duly elected at the special meeting on July 2nd. The Firm, as a third party vendor of legal services, is in no different or better position than any other vendor. Under the general rule discussed above, it cannot collaterally attack the election, and hence the status and authority, of the Signal Directors.[8]

■ Assuming the Firm could collaterally attack the election, it has nonetheless failed to offer evidence tending to show a contest or dispute. A person cannot deprive a director of his *de jure* status simply by saying "I contest your election." The dispute must be *bona fide,* and properly raised before the appropriate forum. The Bernard Group's preemptive strike fizzled when the state court refused to enjoin the election. The only evidence shows that there was no *bona fide* dispute: Justice Ramos stated that the Bernard Group's "undisputed violations" entitled Signal to call for the election of new directors. (*Williams Affidavit,* Ex. "B", at 2–3.) Further, the Firm has not submitted evidence of subsequent proceedings, but we know that no one contested the election in Delaware Chancery Court in accordance with Del. Corp. Law § 225(a). It is true that the Bernard Group ultimately conceded the authority of the Signal Board in the September 18, 1997 stipulation and order, but its total capitulation hardly proves a preexisting *bona fide* dispute. I conclude, therefore, that the Firm has failed to raise a triable issue regarding the *de jure* status of the Signal Directors at any time following the July 2nd election.

■ In any event, a legitimate pending election contest would not prevent the Signal Board from firing the Firm. The Firm's fundamental premise—that the displaced board continues to govern until the dispute is resolved—is wrong. To the contrary, the newly elected directors continue as *de facto* directors until a court of competent jurisdiction ousts them. *See Levin v. Metro–Goldwyn–Mayer, Inc.,* 221 A.2d 499, 503 (Del.Ch.1966)(until their election is confirmed or the newly elected directors are removed, they continue as *de facto* directors); *Smith v. Bayou Rentals, Inc.,* 345 So.2d 1229, 1231 (La.Ct.App.1977)(*de facto* directors continue in that capacity until removed by proper corporate action); *see generally Fletcher* § 374, at 217.

The cases cited by the Firm in support of the opposite conclusion are distinguishable, and in one instance, misread. They do not support the supposition that until a contested election has been resolved, the displaced board is the only one vested with the authority to manage the corporation. For example, in *Empire Southern Gas Co. v. Gray,* 46 A.2d 741 (Del.Ch.1946), which involved a corporate power struggle, officers sent out fraudulent proxy solicitations in support of their slate of directors. The corporation, through the current board, sought to enjoin the upcoming shareholders' meeting, and the officers contended that it lacked authority to maintain the proceeding. In the portion of the opinion cited by the Firm, the court ruled that the power struggle did not affect the authority of the incumbent board to speak for the corporation or maintain the injunction proceeding. *Id.* at 744.

The Firm seizes on the phrase "incumbent board" but ignores the important distinction that *Empire Southern Gas* involved a pre-election challenge; the "incumbent board" was the old board. This case involves a post-election dispute (the

---

8. The Firm clearly lacks standing to maintain a direct challenge under Del. Corp. Law § 225(a).

state court having refused to stop the election), and the Signal Board is the "incumbent board." The case does not support the proposition that the ousted directors continue to run the corporation until a court determines that they do not—the issue was not before the court.

*Campbell v. Loew's, Inc.,* 134 A.2d 852 (Del.Ch.1957) also involved a pre-election suit for injunctive relief. There, a shareholder sought to enjoin a vote concerning the removal of directors for cause. The Delaware court observed that ordinarily, a court should not interfere with an effort to remove directors. Where, however, the procedure for removal is invalid on its face, a shareholder may attack the matter before the meeting to avoid delay and unnecessary expense. *Id.* at 859. Like *Empire Southern Gas, Loew's* does not address the authority of the outgoing and incoming boards, pending the resolution of the post-election contest.

Finally, while *Levin v. Metro–Goldwyn–Mayer, Inc.,* 221 A.2d 499 (Del.Ch.1966) did involve an effort to nullify corporate action that had already occurred, its *dicta* undercuts rather than supports the Firm's position. There, the board called a special stockholder's meeting to authorize a stock split and increase in the number of authorized shares. The meeting was held and the measure was approved. A stockholder then sought to enjoin the filing of the amendment or issuance of the additional stock, citing, *inter alia,* irregularities in vote counting. The plaintiff analogized his action to one brought under Del. Corp. Law § 225 challenging the validity of a corporate election.

The court denied the temporary restraining order. Responding to the plaintiff's § 225 analogy, the court observed that election disputes, "by their very nature take place after those directors whose title is contested have taken office," and "[u]ntil their election is confirmed or they are ordered removed from office, they continue as *de facto* officers." *Id.* at 503. Thus, the case supports the proposition

that the newly-elected directors continue as *de facto* directors until the election dispute has been resolved.

To summarize, the Signal Directors have been the *de jure* directors since their election. No shareholder or director has challenged their election under Del. Corp. Law § 225, and the Firm lacks standing to do so. Further, there is no proof offered of a *bona fide* contest. But even if a legitimate contest existed, the Signal Directors were *de facto* directors until a court acted to invalidate the election and remove them. Obviously this never occurred. Consequently, the Signal Board had the authority to fire the Firm on July 24, 1997, and insist on the return of the retainer.

## C. The Bernard Group's Authority

■ The Firm next contends that the Bernard Group had actual or apparent authority to hire it. This may be correct but is beside the point. The question is not the Bernard Group's authority to hire the Firm, but the Signal Board's power to fire it. To the extent the Firm implies that the Bernard Group had the authority to continue the retention after the Signal Board dismissed the Firm, the argument fails.

■ Although the president of the corporation may hire an attorney, at least in an emergency, the board may limit that authority, and the power to hire employees, including attorneys, ultimately rests with the board. *Rothman & Schneider v. Beckerman,* 2 N.Y.2d 493, 161 N.Y.S.2d 118, 141 N.E.2d 610, 613 (1957); *In re Bernheimer,* 4 Misc.2d 503, 43 N.Y.S.2d 300, 302–03 (N.Y.Sup.Ct.), *aff'd,* 266 A.D. 868, 43 N.Y.S.2d 277 (1943); *see generally* 2 *Fletcher* §§ 466.30, at 471; 513, at 568. The Signal Board fired the Firm, and the Bernard Group officers, in the exercise of day-to-day control over the corporation's affairs, could not countermand the board's express direction. Further, the Board's letter of August 4, 1997, advising BNY that it should continue to deal with the officers on daily financing matters, does

not ratify other officer actions or vest the officers with authority that the Signal Board expressly withdrew. Hence, the Bernard Group, acting as officers, had no actual authority to continue the Firm's retention in light of the contrary direction from the Signal Board.

 The Bernard Group also lacked apparent authority. Apparent authority consists of two elements: (1) the principal was responsible for the appearance of authority, and (2) reliance on that appearance was reasonable. *FDIC v. Providence College*, 115 F.3d 136, 140 (2d Cir.1997); *Herbert Construction Co. v. Continental Ins. Co.*, 931 F.2d 989, 993–994 (2d Cir.1991). However, one who deals with a corporate agent does so at his peril, and must make the necessary effort to discover the scope of the agent's authority. *General Overseas Films, Ltd. v. Robin Int'l, Inc.*, 542 F.Supp. 684, 688 (S.D.N.Y.1982), *aff'd*, 718 F.2d 1085 (2d Cir.1983) (citing *Ford v. Unity Hosp.*, 32 N.Y.2d 464, 346 N.Y.S.2d 238, 299 N.E.2d 659, 664 (1973)). He cannot ignore warnings that the agent's authority is limited, and must act diligently to determine if the agent is exceeding the scope of his authority. *General Overseas Films, Ltd. v. Robin Int'l, Inc.*, 542 F.Supp. at 695.

The Firm again points to the Bernard Group's day-to-day control of Masterwear and the August 4th letter as evidence of its apparent authority. Once the Signal Board discharged the Firm, the Firm had the duty to investigate the scope of the Bernard Group's authority. If it did not already know it, the Firm would have discovered that the state court refused to enjoin the election, and the shareholders elected the Signal slate. Further, neither the August 4th letter nor the Bernard Group's general day-to-day management authority neutralizes or erases the specific authority exercised by the board. Finally, there is no evidence that the Firm ever saw or relied on the August 4th letter which was written some ten days after the Firm was discharged.[9]

*Smith v. Bayou Rentals, Inc.*, 345 So.2d 1229 (La.Ct.App.1977) is instructive on this issue. There, the defendant corporation originally had three directors-the founder and his two sons, the Dunham brothers. After the founder's death, the shareholders elected the widow and two more directors, bringing the total to five although the corporate charter authorized only three. After dissension apparently arose, the Dunham brothers decided to treat the recent election as a nullity. This left them the only directors. They held an unpublicized meeting and elected Smith as the third director. They also approved the payment of Smith's $15,000.00 fee for services rendered to the corporation *after* the election of the five person board. *Id.* at 1230–31. When the corporation did not pay the bill, Smith sued.

At trial, Smith testified that he had dealt with the Dunham brothers over the years. He knew they were directors, and had no reason to question their status on the defendant's board. When he was approached to do work for the defendant, he believed that the Dunham brothers were acting within their authority to retain him. If they lacked actual authority, they at least had apparent authority. *Id.* at 1231.

The court rejected the argument, concluding that under the circumstances, "Smith knew or should have known that the authority of the Dunham brothers was not what it seemed to be." *Id.* at 1232. Smith knew that the widow controlled a majority of the stock and the other two directors were active in the defendant, but he did not have any contact with them. Further, he had discussed the status of the board with an attorney, and therefore, presumably knew about the election contest. In addition, his close relationship with the

---

**9.** Moreover, the limited authority over the daily aspects of the BNY financing does not create an appearance of authority to hire lawyers for the purpose of entering into a common law composition.

Dunham brothers and his support for their faction compelled the conclusion that he knew they had acted without approval of the other principals, and "was not an uninformed bystander who was misled by the authority which the Dunham brothers had." *Id.*

The Firm is in no better position than Smith, and in fact, is in a worse one. The Firm was hired to effect a common law composition. It knew (or should have known) about the July 2 election, but in any event, knew that the Signal Directors comprised the new management. Yet there is no evidence that it ever had contact with or took direction from the Signal Board in connection with its extraordinary assignment—except to ignore the board when it fired the Firm. Thereafter, the Firm sided with the Bernard Group, and has appeared as counsel to Norman Bernard in these bankruptcy cases. *See, e.g., In re Masterwear Corp.,* No. 98 Civ. 6086, 1999 WL 135183 (S.D.N.Y. Mar. 12, 1999); *In re Masterwear Corp.,* No. 98 Civ. 0688, 1998 WL 879694 (S.D.N.Y. Dec. 16, 1998). The Firm was not an innocent bystander, and cannot rely on apparent authority to justify its disregard of the Signal Board's clear direction.

### D. The Firm's Ethical Concerns

■ The Firm next argues that the rules of zealous advocacy, Disciplinary Rule 7–101; N.Y. Comp.Codes R. & Regs., tit. 22, § 1200.32, required it to continue to represent Masterwear until the contested election was resolved. The argument cites the wrong ethical rules, and is obviously interposed as an afterthought to circumvent the Signal Board's direction.

■ A client has an absolute right to fire his attorney at any time with or without cause. *In re Cooperman,* 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069, 1072 (1994); *In re Montgomery's Estate,* 272 N.Y. 323, 6 N.E.2d 40, 40

(1936); *Martin v. Camp,* 219 N.Y. 170, 114 N.E. 46, 48 (1916). The discharged attorney is then ethically obligated to withdraw from employment, Disciplinary Rule 2–110(B)(4); N.Y. Comp.Codes R. & Regs., tit. 22, § 1200.15(b)(4), and refund the unearned portion of the retainer. Disciplinary Rule 2–110(A)(3); N.Y. Comp.Codes R. & Regs., tit. 22, § 1200.15(a)(3). Prior to his actual withdrawal, he must take steps, to the extent practical, to avoid foreseeable prejudice to the rights of his client. These include giving notice to the client, allowing time to employ new counsel, delivering all necessary papers and property to the client and complying with applicable law and rules. Disciplinary Rule 2–110(A)(2); N.Y. Comp.Codes R. & Regs., tit. 22, § 1200.15(a)(2).

Here, the Firm disregarded the mandate of Disciplinary Rule 2–110 as nothing prevented its immediate withdrawal. The Signal Board was presumably aware that Masterwear had financial problems to deal with. The Bernard Group officers that hired the Firm were still the officers. In addition, the Firm knew that Masterwear was now represented by Coleman & Rhine, LLP, the same law firm that had represented Signal.[10] The Firm has failed to explain why Coleman & Rhine could not step in to protect Masterwear's interests. Finally, the Firm has not demonstrated that it delivered the relevant records and property to the Board to enable it to address the issues involved in the composition. In truth, the Firm took sides in a dispute that did not concern it as corporate counsel. In the process, it continued the representation against its client's wishes.

### E. The Firm's Right to *Quantum Meruit* Recovery

■ In its final argument, the Firm contends that it is entitled to recover fees, including those relating to post-discharge work, on a *quantum meruit* basis. Because the client has an absolute right to

---

**10.** Howard Rhine, Esq. of Coleman & Rhine authored the letter that discharged the Firm as counsel to Masterwear. (*See Angel Affirmation,* Ex. "F".)

fire his lawyer, the discharged attorney cannot recover damages for breach of contract. *Martin v. Camp*, 114 N.E. at 48; *see In re Montgomery's Estate*, 6 N.E.2d at 40–41. He can, however, recover in *quantum meruit* for the reasonable value of the completed services.[11] *In re Cooperman*, 611 N.Y.S.2d 465, 633 N.E.2d at 1072; *In re Montgomery's Estate*, 6 N.E.2d at 40–41; *Martin v. Camp*, 114 N.E. at 48. Conversely, the discharged lawyer cannot foist future services on the former client, and insist that the former client pay for them. This would effectively undercut the policy that permits the client to discharge his attorney at any time.

■ Here, the Firm was discharged without cause on July 24th, and may recover on a *quantum meruit* basis for the reasonable value of the services rendered until then. The criteria for measuring reasonable fees under New York law begins with the eight factors set out in Disciplinary Rule 2–106(B), N.Y. Comp.Codes R. & Regs., tit. 22, § 1200.11(b).[12] These are consistent with the twelve factor approach adopted by the court in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 719 (5th Cir.1974); *accord Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 562 n. 7, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (the *Johnson* factors are taken from DR 2–106); *Hens-*

*ley v. Eckerhart*, 461 U.S. 424, 430 n. 3, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (the *Johnson* factors "derive directly from" DR 2–106). The same general principles also apply to compensation awards under § 330 of the Bankruptcy Code. *In re Manoa Fin. Co.*, 853 F.2d 687, 690–91 (9th Cir.1988); *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575, 580 n. 12 (E.D.N.Y.1990); *see In re Apex Oil Co.*, 960 F.2d 728, 731 (8th Cir.1992).

■ To facilitate the consideration of the relevant factors, courts have adopted the "lodestar" approach. This involves multiplying the reasonable attorney billing rate by the reasonable number of hours expended. *See Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir.1999); *In re Cena's Fine Furniture, Inc.*, 109 B.R. at 581. The "lodestar" includes "most, if not all" of the factors relevant to determining a reasonable fee. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. at 566, 106 S.Ct. 3088; *see Blum v. Stenson*, 465 U.S. 886, 898–900, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (the "lodestar" incorporates most of the *Johnson* factors). Further, it is "sufficiently congruent with the criteria applicable under New York law to justify such a choice of calculation methodology" in determining the reasonable value of an attorney's fees. *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136,

---

**11.** Upon discharge, the retainer agreement is abrogated and does not limit the amount that the attorney may recover. *In re Montgomery's Estate*, 6 N.E.2d at 41; *Tillman v. Komar*, 259 N.Y. 133, 181 N.E. 75, 75 (1932). The retainer agreement may nevertheless be taken into consideration with the other elements in ascertaining *quantum meruit*. *Tillman v. Komar*, 181 N.E. at 75; *Brill v. Chien Yuan Kao*, 61 A.D.2d 1000, 402 N.Y.S.2d 642, 643 (1978).

**12.** DR 2–106(B) states:

A fee is excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent or made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

148–49 (2d Cir.1998). Adjustments to the "lodestar" amount are proper only in rare and exceptional cases supported by specific evidence and detailed findings. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. at 565, 106 S.Ct. 3088; *see Blum v. Stenson*, 465 U.S. at 901, 104 S.Ct. 1541.[13]

The fee applicant has the burden of proving the reasonableness of the billing rates and the number of hours expended, and must submit contemporaneous time records that support the hours worked and rates claimed.[14] *TOYS "R" US, Inc. v. Abir*, No. 97 Civ. 8673, 1999 WL 61817, at *1 (S.D.N.Y. Feb. 10, 1999); *see New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147–48 (2d Cir.1983); *Tri–Star Pictures, Inc. v. Unger*, 42 F.Supp.2d 296, at 303 (S.D.N.Y.1999). The reasonable hourly rates are the prevailing rates for similar services by lawyers of reasonably comparable skill, experience and reputation in the relevant market—here, New York City. *Id.; Sucre v. MIC Leasing Corp. (In re Sucre)*, 226 B.R. 340, 352 (Bankr. S.D.N.Y.1998); *see Blum v. Stenson*, 465 U.S. at 895 n. 11, 104 S.Ct. 1541. If the applicant carries that burden, the "lodestar" amount is presumed to be the rea-sonable fee. *Blum v. Stenson*, 465 U.S. at 897, 104 S.Ct. 1541.

In the present case, Mr. Angel, the only attorney involved through July 24th, rendered 7.3 hours of service and billed his time at $500.00 per hour. (*See Williams Affidavit*, Ex. "K", at 1.) This translates to a "lodestar" amount of $3,650.00. The evidence produced on this motion or otherwise available supports the conclusion that this is a reasonable fee for the pre-discharge services.[15] The reasonable value of an attorney's time is the price his time commands in the relevant market, and is normally reflected in the attorney's customary billing rate. *Cunningham v. City of McKeesport*, 753 F.2d 262, 267 (3d Cir.1985), *vacated on other grounds*, 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731, *original decision reinstated*, 807 F.2d 49 (3d Cir.1986), *cert. denied*, 481 U.S. 1049, 107 S.Ct. 2179, 95 L.Ed.2d 836 (1987); *see Islamic Ctr. of Miss., Inc. v. City of Starkville, Miss.*, 876 F.2d 465, 469 (5th Cir. 1989). The $500.00 per hour Mr. Angel charged Masterwear is the same amount that he billed his other clients during this same time frame.[16] Further, my colleagues have awarded fees in other cases to the Firm for services during the same

---

**13.** Just what circumstances will justify an adjustment are unclear. For example, in *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir.1977), the Court of Appeals stated that the "lodestar" calculation may be adjusted by less objective factors such as the risk of litigation, the complexity of the issues and the skill of counsel. *Id.* at 1098. Several years later, in *Blum v. Stenson*, the Supreme Court observed that the "lodestar" presumably reflected the less objective criteria like novelty, complexity, counsel's skill as well as the results obtained. 465 U.S. at 898–900, 104 S.Ct. 1541; *accord Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. at 565, 106 S.Ct. 3088. To the extent that risk is a consideration, the Firm did not face any; it negotiated a flat fee arrangement and received a retainer.

**14.** The actual time slips need not be produced; "an affidavit attaching a computerized printout of the pertinent contemporane- ous time records is acceptable." *Tri–Star Pictures, Inc. v. Unger*, 42 F.Supp.2d 296, at 303 (S.D.N.Y.1999). Mr. Angel attached a printout of his contemporaneous time records to his original affirmation, (*see Angel Affirmation*, Ex. "D"), and this suffices.

**15.** Masterwear apparently agrees. It has asked for partial summary judgment in the sum of $16,350.00. (*See [Plaintiff's] Memorandum of Law in Opposition to Motion for Summary Judgment*, dated Mar. 12, 1999 ("*Masterwear Mem.*"), at 18 n. 6.)

**16.** *See In re I. Appel Corp.*, No. 97 B 42819(JHG) (*Debtor's Application for Authority to Employ Angel & Frankel, P.C. as its Attorneys*, dated Apr. 29, 1997, Ex. "A"); *In re Home Fashions Outlet, Inc.*, No. 97 B 43790(AJG) (*Debtor's Application for Authority to Employ Angel & Frankel, P.C. as its Attorneys*, dated June 6, 1997, Ex. "A").

period based upon Mr. Angel's $500.00 hourly rate.[17]

Additionally, the services rendered by Mr. Angel fall within the range of reasonableness. His records reflect that prior to July 24th, he conferred with members of the Bernard Group and their litigation counsel, Jeffrey Mann, Esq. Although some of the services may arguably have involved the personal representation of the Bernard Group,[18] the time charges at issue are small, and it is at least arguable that Mr. Angel had to learn about Signal's and the Bernard Group's claims and interests to represent Masterwear adequately in connection with the common law composition. Further, there is no evidence of duplication or unnecessary work. Finally, no one has argued for an adjustment to the "lodestar" amount, and there is nothing in the record to support an adjustment. *See* footnote 13, *supra.*

### F. Masterwear's Request for Summary Judgment

Masterwear has not formally sought affirmative relief, but its papers request it. First, Masterwear maintains that it is entitled to partial summary judgment for the recovery of the $20,000.00, less the value of the 7.3 hours of services rendered by Mr. Angel, *i.e.*, for $16,350.00. (*Masterwear Mem.*, at 18 n. 6.) Second, Masterwear argues, citing *HBE Leasing Corp. v. Frank*, 61 F.3d 1054 (2d Cir.1995), that the payment of the retainer is fraudulent as a matter of law, and judgment should be entered for the entire amount. (*Id.*)

Masterwear's request for summary judgment in its opposition memorandum put the Firm on notice, *see Aviation Dev. Co. v. C&S Acquisition Corp.*, No. 97 Civ. 9302, 1999 WL 46630, at *1 n. 1 (S.D.N.Y. Feb. 2, 1999); *First Investors Corp. v. Liberty Mutual Ins. Co.*, 955 F.Supp. 274, 279 (S.D.N.Y.1997), *aff'd*, 152 F.3d 162 (2d Cir.1998), and may constitute the equivalent of a formal cross motion. *Rivkin v. Diversified Realty Group Partners*, No. 86 Civ. 9048, 1988 WL 127069 at *3 (S.D.N.Y. Nov. 22, 1988). Regardless, however, of how we treat the request, a motion for summary judgment searches the record. The court may grant summary judgment *sua sponte* to the nonmoving party provided the record is fully developed and the moving party has not suffered procedural prejudice. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991); *Local 33 v. Mason Tenders*, 291 F.2d 496, 505 (2d Cir.1961) (Medina, J.) ("it is most desirable that the court cut through mere outworn procedural niceties and make the same decision as would have been made had defendant made a cross-motion for summary judgment"); 10A Charles A. Wright, *et al., Federal Practice & Procedure: Civil* § 2720, at 347 (1998). Awarding summary judgment to the nonmoving party is appropriate where the decision is based on the same issues as the original motion, and the moving party had significant incentive to offer compelling evidence in support of its own motion because the court cannot draw favorable inferences on its behalf. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d at 167–68; *see International Union of*

---

**17.** *Compare In re I. Appel Corp.*, No. 97 B 42819(JHG) (*Application of Angel & Frankel, P.C. [for First Interim Award of Compensation and Reimbursement of Expenses]*, dated Nov. 20, 1997) (cover sheet) *with id.* (*Order Awarding First Interim Compensation [etc.]*, dated Dec. 22, 1997); *compare In re Arlco, Inc., HFO, Inc. & Home Fashions Outlet, Inc.*, Nos. 97 B 43789, 97 B 43790(AJG) (*Application of Angel & Frankel, P.C. . . . for a First Interim Award of Compensation and Reimbursement of Expenses*, dated Nov. 26, 1997) (cover sheet) *with id.* (*Order Granting Applications for Interim Allowance of Compensation and Reimbursement of Expenses [etc.]*, dated Dec. 18, 1997).

**18.** For example, on July 21, 1997, Mr. Angel reviewed materials relating to a lawsuit (presumably Masterwear's against the Bernard Group) and employment agreements (presumably, again, those involving the Bernard Group).

*Bricklayers & Allied Craftsmen v. Gallante,* 912 F.Supp. 695, 700, 703 (S.D.N.Y. 1996).

■ Here, it is appropriate to award partial summary to Masterwear for the balance of the retainer. I have already concluded that the Firm is entitled to reasonable compensation for services rendered up to its July 24th discharge, but not thereafter. The Firm's own motion established the extent and limits of its recovery. It had the incentive to offer all relevant evidence in support of its *quantum meruit* claim, including any fee enhancement, and there is nothing further to offer or decide on Masterwear's right to the balance. Masterwear is therefore entitled to partial summary judgment in the sum of $16,350.00.

■ Masterwear is not, however, entitled to summary judgment for the entire $20,000.00 under its fraudulent transfer theory. In *HBE Leasing Corp. v. Frank,* 61 F.3d 1054 (2d Cir.1995), the Court of Appeals ruled that a substantial transfer made by the judgment debtor to his attorney to secure future legal services of uncertain scope and duration was not made for fair consideration under the New York Debtor & Creditor Law. *Id.* at 1061. The Court noted, however, that an advance for fixed and definite future services to be commenced immediately might constitute fair consideration, where good faith and proportionality existed. *Id.* (citing *Hay v. Duskin,* 9 Ariz.App. 599, 455 P.2d 281, 286–87 (1969)). "Where to draw the line between permissible present advances and promises of indefinite services may be difficult in close cases. . . ." *Id.*

HBE Leasing does not support the summary disposition of Masterwear's fraudulent transfer claim. To begin with, a portion of the retainer covered an antecedent debt rather than future services. The Firm was retained on June 18, 1997, and by July 22nd, the date of payment, it had provided 7.3 hours of services. I have already ruled that the Firm is entitled to

recover the reasonable value of these services.

Moreover, the circumstances of the Firm's retention and the payment of the retainer are quite different from those in *HBE Leasing.* The Firm was given a fixed and definite mission—to effect a common law composition. Although a duration was not specified, the emergent circumstances implied that it would necessarily be brief. The retainer does not appear to be disproportionate to the anticipated services; at least there is no evidence that it was. Finally, there is no evidence that the Firm accepted the retainer in bad faith.

### CONCLUSION

The Firm is entitled to partial summary judgment in the sum of $3,650.00, representing the reasonable value of its services between June 18, 1997 and July 24, 1997. Masterwear is entitled to partial summary judgment in the sum of $16,350.00, representing the balance. In all other respects, the Firm's motion for summary judgment, and Masterwear's request for summary judgment, are denied. The parties are directed to appear at a conference on May 6, 1999, at 10:00 a.m., to discuss further proceedings.

Settle order on notice.